Westlaw.

--- F.3d ----, 2011 WL 1631947 (C.A.1 (Me.))
(Cite as: 2011 WL 1631947 (C.A.1 (Me.)))

**H**
Only the Westlaw citation is currently available.

United States Court of Appeals,
First Circuit.
UNITED STATES of America, Appellee,
v.
Russell E. **BOOKER**, Defendant, Appellant.
United States of America, Appellee,
v.
Michael Wyman, Defendant, Appellant.

Nos. 09–1810, 09–2302.
May 2, 2011.

Appeals from the United States District Court for the District of Maine, John A. Woodcock, Jr., U.S. District Judge.
Virginia G. Villa, Assistant Federal Defender, for appellants.

Renée M. Bunker, Assistant U.S. Attorney, with whom Thomas E. Delahanty II, United States Attorney, was on brief, for appellees.

Before LYNCH, Chief Judge, LIPEZ and HOWARD, Circuit Judges.

LIPEZ, Circuit Judge.
  *1 Appellants Russell Booker and Michael Wyman were convicted under 18 U.S.C. § 922(g)(9), a law that prohibits individuals convicted of a "misdemeanor crime of domestic violence" from possessing, shipping, or receiving firearms. The appellants' convictions under § 922(g)(9) each rested on a prior misdemeanor offense under Maine's simple assault statute. In this consolidated appeal, the appellants press two primary arguments. First, they contend that only an *intentional* offense can qualify as a "misdemeanor crime of domestic violence" within the meaning of § 922(g)(9), and therefore the fact of a conviction under Maine's undifferentiated assault statute, which may be violated "intentionally, knowingly, or recklessly," cannot alone establish the commission of a predicate domestic violence offense under § 922(g)(9). Second, the appellants argue that § 922(g)(9) unconstitutionally abridges their Second Amendment right to bear arms.[FN1] After careful consideration of each of these arguments, we find them unpersuasive. Accordingly, we affirm.

  FN1. Although the appellants do not describe these as alternative arguments, we would reach the constitutional argument only if we rejected the statutory argument. That is the case here.

I.
  In describing the facts underlying Russell Booker's and Michael Wyman's convictions, we rely on the versions of the facts agreed to by each defendant at his change-of-plea hearing and, to a limited extent, on state court records proffered by the government.[FN2]

  FN2. We look to these records only for details concerning the sentencing and disposition of the state court convictions, and not for the facts of the underlying misdemeanor offenses.

**A. Russell Booker**
  In 1998, Russell Booker pled guilty in the district court in Skowhegan, Maine, to one count of simple assault against his then-wife, Cheryl Booker. Tracking the language of Maine's assault statute, Me.Rev.Stat. Ann. tit. 17–A, § 207, the criminal complaint alleged that Booker "did intentionally, knowingly, or recklessly cause bodily injury or offensive physical contact" to his wife. Booker was sentenced to a term of 364 days' incarceration, all but fourteen days of which was suspended, and a year's probation. In addition, the court fined Booker $570, ordered that he complete a domestic violence program, and forbade him any contact with his wife until both she and a domestic violence counselor

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.3d ----, 2011 WL 1631947 (C.A.1 (Me.))
(Cite as: 2011 WL 1631947 (C.A.1 (Me.)))

approved contact in writing.

Eight years later, in 2006, Booker accidentally shot a hunting companion with a .50–caliber blackpowder rifle while deer hunting. Officers from the Maine Warden Service, who were called to investigate, questioned both Booker and his injured companion. In the course of that questioning, the officers learned that Booker was an avid hunter and owned a number of firearms. Based on this information and the record of Booker's prior domestic assault conviction, the federal Bureau of Alcohol, Tobacco, and Firearms obtained a search warrant for Booker's residence. Federal officers executed the warrant and found seven firearms in a gun case in Booker's home.

In January 2008, a federal grand jury indicted Booker on two counts of knowing possession of a firearm by an individual convicted of a misdemeanor crime of domestic violence, in violation of 18 U.S.C. § 922(g)(9). Booker pled not guilty. He proceeded to file a series of motions to dismiss the indictment, arguing, inter alia, that (1) since Maine's simple assault statute reaches reckless as well as intentional conduct, a conviction pursuant to the statute does not necessarily involve a sufficient mens rea to qualify as a predicate "misdemeanor crime of domestic violence" within the meaning of § 922(g)(9); and (2) § 922(g)(9)'s restriction on individual possession of firearms violates the Second Amendment. The district court denied each of Booker's motions. After the Supreme Court issued its opinion in *District of Columbia v. Heller,* 554 U.S. 570 (2008), Booker moved for reconsideration of his argument for dismissal under the Second Amendment, which the court again denied.

*2 In September 2008, Booker entered into a conditional plea agreement. He reserved the right to appeal a number of the district court's orders, including those disposing of his motions to dismiss the indictment. Following a change-of-plea hearing, the court accepted Booker's conditional plea. In June 2009, the district court entered judgment and sentenced Booker to three years' probation and a $1000 fine.

**B. Michael Wyman**

In 2002, Michael Wyman pled guilty in the Waldo County Superior Court to simple assault against his live-in girlfriend, Betsy Small. The criminal complaint, like the complaint filed in Booker's assault case, alleged that Wyman "did intentionally, knowingly, or recklessly cause bodily injury or offensive physical contact" to Small. The court sentenced Wyman to seventy-two hours' incarceration in county jail and imposed a $10 fine.

Roughly six years later, in 2008, Wyman again ran afoul of the law. Wyman and Small were in the process of breaking off their relationship and had arranged for Small to stop by Wyman's house to pick up her belongings. Small arrived with three friends, her fourteen-year-old son, and an infant daughter. The presence of Small's friends angered Wyman, who emerged from the house intoxicated, yelling, and carrying a loaded shotgun. After Wyman fired the gun into the trees, Small and her companions quickly departed.

Wyman called 9–1–1 and reported that he had fired a gun at the back of his house to encourage Small and her friends to leave. Two county sheriffs were dispatched to Wyman's house, where Wyman readily admitted to firing the shotgun and was placed under arrest. Before they left, Wyman asked one of the sheriffs to stoke his wood stove and turn off the lights in his house. Inside the house, the sheriff noted a gun rack containing several firearms, and Wyman identified the shotgun that he had used to drive off Small and her friends. The sheriff secured and seized the shotgun.

In August 2008, a federal grand jury indicted Wyman on a single count of knowing possession of a firearm by an individual convicted of a misdemeanor crime of domestic violence, in violation of 18 U.S.C. § 922(g)(9). Wyman pled not guilty, and filed a motion to dismiss the indictment on grounds identical to those asserted by Booker: that (1) a conviction pursuant to Maine's simple assault stat-

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.3d ----, 2011 WL 1631947 (C.A.1 (Me.))
**(Cite as: 2011 WL 1631947 (C.A.1 (Me.)))**

ute, which reaches reckless as well as intentional conduct, does not necessarily involve a sufficient mens rea to categorically qualify as a "misdemeanor crime of domestic violence" under § 922(g)(9); and (2) § 922(g)(9)'s prohibition on possession of firearms is in derogation of the Second Amendment. The district court denied the motion.

Wyman entered into a conditional plea agreement in March 2009, reserving his right to appeal the district court's order denying his motion to dismiss the indictment. In September 2009, the court entered judgment and sentenced Wyman to incarceration of a year and one day, with three years' supervised release to follow.

**C. Appeal and Consolidation**
*3 Booker and Wyman each timely appealed his conviction under 18 U.S.C. § 922(g)(9). The appeals were argued separately, but, because the appellants have raised identical issues in challenging their convictions, we now consolidate their appeals for purposes of this opinion.

**II.**
**A. The Lautenberg Amendment**
The statutory provision under which Wyman and Booker were convicted, 18 U.S.C. § 922(g)(9), was enacted in 1996 as part of the Omnibus Consolidated Appropriations Act of 1997. Known commonly as the Lautenberg Amendment to the Gun Control Act of 1968 (or simply the "Lautenberg Amendment"), the provision makes it "unlawful for any person ... who has been convicted in any court of a misdemeanor crime of domestic violence, to ... possess in or affecting commerce, any firearm or ammunition."

With its enactment of the Lautenberg Amendment, Congress recognized a problem of significant national concern in the combination of domestic violence and guns, and saw the existing law as insufficiently protective of its victims. *See, e.g.,* 142 Cong. Rec. S8831 (daily ed. July 25, 1996) (statement of Sen. Lautenberg) (noting national statistics reporting 150,000 domestic violence incidents involving a gun each year). Previously, federal law prohibited possession of firearms only for individuals who had been convicted of a felony. *United States v. Hartsock,* 347 F.3d 1, 5 (1st Cir.2003). Congress concluded that the focus on felony convictions left guns in the hands of a large number of domestic abusers who were convicted of lesser crimes, often due to some combination of plea bargaining, "[o]utdated or ineffective laws [that] treat domestic violence as a lesser offense," and lack of cooperation from victims. 142 Cong. Rec. S10379 (daily ed. Sept. 12, 1996) (statement of Sen. Feinstein). Through the Lautenberg Amendment, Congress sought to "close this dangerous loophole," *id.,* and "establish[ ] a policy of zero tolerance when it comes to guns and domestic violence," 142 Cong. Rec. S8831 (daily ed. July 25, 1996) (statement of Sen. Lautenberg).

The provision defines a "misdemeanor crime of domestic violence" to be an offense that (1) "is a misdemeanor under Federal, State, or Tribal law," (2) "has, as an element, the use or attempted use of physical force, or the threatened use of a deadly weapon," and (3) is "committed by a current or former spouse, parent, or guardian of the victim, by a person with whom the victim shares a child in common, by a person who is cohabiting with or has cohabited with the victim as a spouse, parent, or guardian, or by a person similarly situated to a spouse, parent, or guardian of the victim." 18 U.S.C. § 921(a)(33)(A). The third of these requirements, specifying that the victim of the crime must have been a domestic intimate or similarly situated individual, need not be a formal element of the statute of offense. *United States v. Hayes,* 129 S.Ct. 1079, 1087 (2009). Instead, the government simply must prove beyond a reasonable doubt that the prior offense was committed against a domestic intimate or similarly situated individual. *Id.* Thus, convictions under generic assault and battery statutes may qualify as "misdemeanor crime[s] of domestic violence" under § 922(g)(9).

**B. Maine's Assault Statute**

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.3d ----, 2011 WL 1631947 (C.A.1 (Me.))
**(Cite as: 2011 WL 1631947 (C.A.1 (Me.)))**

Page 4

*4 Maine's simple assault statute provides that "[a] person is guilty of assault if ... [t]he person intentionally, knowingly or recklessly causes bodily injury or offensive physical contact to another person." Me.Rev.Stat. Ann. tit. 17–A, § 207(1). To be convicted of assault under the statute, therefore, an individual must at a minimum be found to have acted recklessly. *See State v. Patterson,* 881 A.2d 649, 651 (Me.2005). Maine law defines recklessness to mean "consciously disregard[ing] a risk" in a manner that, "when viewed in light of the nature and purpose of the person's conduct and the circumstances known to the person," constitutes "a gross deviation from the standard of conduct that a reasonable and prudent person would observe in the same situation." Me.Rev.Stat. Ann. tit. 17–A, § 35(3).

### III.

The first of Booker and Wyman's arguments on appeal turns on the requisite mens rea for a "misdemeanor crime of domestic violence" under § 922(g)(9). As noted above, the Maine assault statute under which the appellants were convicted may be violated either recklessly, knowingly, or intentionally. The two appellants contend that only an intentional offense may qualify as a predicate "misdemeanor crime of domestic violence" within the meaning of § 922(g)(9). They seek support for their interpretation in the provision's reference to the "use or attempted use of physical force," a phrase that also appears in 18 U.S.C. § 16(a) and has been interpreted in that context, the appellants argue, to require a degree of intentionality.

The appellants' argument hangs on the interpretation of the statutory text of §§ 921(a)(33)(A) and 922(g)(9), and thus our review is de novo. *Zimmerman v. Puccio,* 613 F.3d 60, 70 (1st Cir.2010).

### A. The Meaning of a " Misdemeanor Crime of Domestic Violence"

In discerning the meaning of "misdemeanor crime of domestic violence" under § 922(g)(9), we start first, as always, with the language of the statute itself. *United States v. DiTomasso,* 621 F.3d 17, 22 (1st Cir.2010). Where the language of the statute is plain and the meaning unambiguous, we will do no more than enforce the statute in accordance with those plain terms. *Mass. Museum of Contemporary Art Found., Inc. v. Büchel,* 593 F.3d 38, 50 (1st Cir.2010).

We have construed the statutory definition at issue here on two prior occasions. In *United States v. Meade,* 175 F.3d 215 (1st Cir.1999), we considered whether the definition of "misdemeanor crime of domestic violence" required that the qualifying predicate offense include, as a formal element, the relationship between the misdemeanant and victim. *Id.* at 218–21. We held that it did not, finding the language of the statutory definition unambiguous. [FN3] *Id.* at 221.

> FN3. This interpretation of the statute anticipated, and was confirmed by, the Supreme Court's subsequent holding in *Hayes,* 129 S.Ct. 1079.

Two years later, in *United States v. Nason,* 269 F.3d 10 (1st Cir.2001), we revisited § 922(g)(9) to examine the interplay between the definition of a "misdemeanor crime of domestic violence" and the language of Maine's assault statute. As noted above, Maine's assault statute may be violated by conduct causing either "bodily injury" or "offensive physical contact." Me.Rev.Stat. Ann. tit. 17–A, § 207(1). The appellant in *Nason* contended that the reference to "physical force" in the definition of a "misdemeanor crime of domestic violence" could not be reconciled with the latter variant of assault. We disagreed, reading the "plain and unambiguous meaning" of the phrase "physical force" to be "power, violence, or pressure directed against another person's body," which we found broad enough to encompass the "offensive physical contact" variant of Maine's assault statute. *Nason,* 269 F.3d at 16, 20–21.

*5 The appellants suggest that *Nason* is no longer good law, or at a minimum must be reconsidered, in light of the Supreme Court's recent opin-

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.3d ----, 2011 WL 1631947 (C.A.1 (Me.))
(Cite as: 2011 WL 1631947 (C.A.1 (Me.)))

Page 5

ion in *Johnson v. United States,* 130 S.Ct. 1265 (2010). In *Johnson,* the Supreme Court held that a Florida felony conviction for "[a]ctually and intentionally touch[ing]" did not qualify as a "violent felony" under the Armed Career Criminal Act (ACCA),[FN4] 18 U.S.C. § 924(e), because it did not necessarily involve the "use ... of physical force against the person of another." *Johnson,* 130 S.Ct. at 1269–73. The Court read the reference to "physical force," in the context of the ACCA's definition of "violent felony," to mean "force capable of causing physical pain or injury to another." *Id.* at 1271. Because Florida's highest court had interpreted "actually and intentionally touching" to be met by " *any* intentional physical contact, 'no matter how slight,' " *id.* at 1270 (quoting *State v. Hearns,* 961 So.2d 211, 218 (Fla.2007)), the Court held that a conviction under the state statute could not categorically qualify as a violent felony.

> FN4. The ACCA imposes enhanced sentences on "career" criminals (i.e., those who have at least three prior convictions for a "violent felony") convicted of unlawful gun possession under § 922(g).

The appellants argue that this reasoning repudiates *Nason's* holding that "offensive physical contact" involves the "use of physical force" within the meaning of § 922(g)(9). However, the Court expressly rejected the suggestion that its analysis in *Johnson* would have any effect on interpretation of § 922(g)(9), stating:

> We have interpreted the phrase "physical force" only in the context of a statutory definition of "violent felony." We do not decide that the phrase has the same meaning in the context of defining a *misdemeanor* crime of domestic viol- ence.

*Id.* at 1273 (emphasis in original). The appellants' argument for reconsidering *Nason* is thus without merit.

In neither of our previous cases interpreting § 922(g)(9) did we consider the question before us now, namely, whether the federal definition of "misdemeanor crime of domestic violence" can be read to prescribe an intentional state of mind for a qualifying predicate offense. Turning to the statutory language, it is undeniably significant that, of the three elements enumerated in the definition, none specifies a particular—or minimum—mens rea. As set forth above, the only express requirements for a § 922(g)(9) predicate are that it (1) was a misdemeanor, (2) had, "as an element, the use or attempted use of physical force, or the threatened use of a deadly weapon," and (3) was committed against a domestic intimate or similarly situated individual. 18 U.S.C. § 921(a)(33)(A). Nor do any of the terms used in the definition necessarily imply a particular state of mind. In construing terms left undefined by the statute, we must strive to give them their "ordinary or natural meaning." *Smith v. United States,* 508 U.S. 223, 228 (1993). In common parlance, a "use of physical force" may be described as reckless or intentional.

*6 The government, reminding us that we "are not licensed to practice statutory remodeling," *United States v. Griffith,* 455 F.3d 1339, 1344 (11th Cir.2006), invites us to end our analysis here. The government further notes that Congress included a mens rea requirement in the immediately preceding section of the legislation that enacted § 922(g)(9), and argues that Congress knew how to specify a heightened mens rea if it had wanted to include one.[FN5] While we ultimately agree that the absence of a mens rea requirement from the statute is dispositive here, we proceed to address the appellants' arguments to the contrary out of an abundance of caution.

> FN5. The provision enacting § 922(g)(9) is found at section 658 of the Omnibus Consolidated Appropriations Act of 1997. See Pub.L. No. 104–208, § 658, 110 Stat. 3009 , 3009–371 to –372 (1996). Section 657 of that Act amended 18 U.S.C. § 922(q), which made it "unlawful for any individual

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

*knowingly* to possess a firearm ... at a place that the individual knows, or has reasonable cause to believe, is a school zone." *Id.* § 657, 110 Stat. at 3009–369 to –371 (emphasis added).

Appellants' argument for a heightened mens rea requirement rests on analogy to case law interpreting two distinct statutory provisions, (1) the definition of "crime of violence" under 18 U.S.C. § 16 and (2) the definition of "violent felony" under the ACCA, 18 U.S.C. § 924(e). We have previously declined to give determinative weight in our construction of § 922(g)(9) and § 921(a)(33)(A) to decisions interpreting similar language in other statutes, including both § 16 and the ACCA. *See Meade*, 175 F.3d at 221. As we explained in *Meade*, § 922(g)(9) "has a distinct, focused, and singular purpose that is not covered by any of the other statutes," and "precedent teaches that the case for construing one statute in a manner similar to another is weakest when the two have significant differences." *Id.* at 221 (citing *United States v. Granderson*, 511 U.S. 39, 50–51 (1994)). We reach the same conclusion again here.

The appellants first direct our attention to the general definition of a "crime of violence," codified at 18 U.S.C. § 16, which includes "an offense that has as an element the use ... of physical force against the person or property of another." 18 U.S.C. § 16(a).[FN6] In *Leocal v. Ashcroft*, 543 U.S. 1 (2004), the Supreme Court considered whether this definition could encompass a state conviction for driving under the influence and causing serious bodily injury, an offense which typically either has no mens rea element or requires only negligence in the operation of a vehicle.[FN7] Parsing the language of the statute, the Court held that the phrase " 'use ... of physical force against the person or property of another' most naturally suggests a higher degree of intent than negligent or mere accidental conduct," and thus the petitioner's conviction could not be considered a "crime of violence." *Id.* at 9–10. Appellants would have us infer from *Leocal's* treatment of § 16 a heightened mens rea requirement for § 922(g)(9).

FN6. The definition of "crime of violence" codified at 18 U.S.C. § 16 does not pertain to any specific statutory scheme, but instead is "incorporated into a variety of statutory provisions, both criminal and non-criminal." *Leocal v. Ashcroft*, 543 U.S. 1, 7 (2004). Section 16 was originally enacted as part of the Comprehensive Crime Control Act of 1984, Pub.L. No. 98–473, § 1001(a), 98 Stat. 2136.

FN7. The petitioner in *Leocal* was a Haitian citizen and lawful permanent resident of the United States who was ordered deported under 8 U.S.C. § 1227(a)(2)(A)(iii), which renders deportable "[a]ny alien who is convicted of an aggravated felony." *Leocal*, 543 U.S. at 3–4. The case implicated § 16 because the definition of "aggravated felony" includes a "crime of violence" within the meaning of 18 U.S.C. § 16. Prior to the appeal, an immigration judge (and subsequently the Board of Immigration Appeals) had concluded that the petitioner's prior state court conviction for driving under the influence and causing serious bodily injury constituted a conviction of a "crime of violence."

We find appellants' arguments under *Leocal* unavailing for at least two reasons. First, the case for analogizing § 922(g)(9) to § 16 is particularly weak. In the course of drafting § 921(a)(33)(A), Congress expressly rejected § 16's definition of "crime of violence," adopting a definition of "misdemeanor crime of violence" that was, according to the sponsor of the Lautenberg Amendment, "probably broader" than the definition of "crime of violence" in § 16. 142 Cong. Rec. S11872–01, S11877 (daily ed. Sept. 30, 1996) (statement of Sen. Lautenberg). Second, even if we were to find § 16 an appropriate analog, *Leocal* would not answer the question before us. In holding that the language

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.3d ----, 2011 WL 1631947 (C.A.1 (Me.))
**(Cite as: 2011 WL 1631947 (C.A.1 (Me.)))**

of § 16 "requir[es] a higher *mens rea* than ... merely accidental or negligent conduct," *id.* at 11, the Court expressly reserved judgment on whether an offense involving the *reckless* use of force against a person or property may constitute a crime of violence under § 16.[FN8] *Id.* at 13. The Court has not revisited the question. Likewise, we have not yet had occasion to consider the issue. *But see Fernandez–Ruiz v. Gonzales,* 466 F.3d 1121, 1129–30 (9th Cir.2006) (holding that reckless conduct falls outside the ambit of § 16); *Tran v. Gonzales,* 414 F.3d 464, 470–71 (3d Cir.2005) (same).

> FN8. Additionally, as the district court pointed out in its order denying Booker's first motion to dismiss the indictment, *United States v. Booker,* 555 F.Supp.2d 218, 222, 225 (D.Me.2008), *Leocal* gave "significant weight" in interpreting the definition of "crime of violence" to contextual cues that are absent here, 543 U.S. at 12 n. 9. Specifically, the Court focused on the fact that the Immigration and Naturalization Act, pursuant to which the petitioner in *Leocal* was facing deportation, elsewhere defined a "serious criminal offense" to include § 16's definition of a "crime of violence" *as well as* "any crime of reckless driving or of driving under the influence of alcohol ... if such crime involves personal injury to another." *Id.* at 11–12 & n. 9 (quoting 8 U.S.C. § 1101(h)). The Court found this separate listing of § 16 and DUI offenses "revealing" and concluded that it "strongly supports our construction of § 16." *Id.* at 12 & n. 9. As the district court aptly noted here, there is no analogous contextual support for distinguishing between an intentional domestic assault and a reckless one. *Booker,* 555 F.Supp.2d at 225.

*7 The appellants' reliance on authority interpreting the definition of "violent felony" under the ACCA fares no better. The ACCA defines a "violent felony" to be a crime punishable by a term of more than a year that either (1) "has as an element the use, attempted use, or threatened use of physical force against the person of another" or (2) "is burglary, arson, or extortion, involves use of explosives, or otherwise involves conduct that presents a serious potential risk of physical injury to another." 18 U.S.C. § 924(e)(2)(B). The two prongs of this definition are often referred to as the "force clause" and the "residual clause," respectively. *See United States v. Dancy,* No. 09–2628, 2011 WL 1418854, at *9 (1st Cir. Apr. 13, 2011).

The appellants cite the Supreme Court's decision in *Begay v. United States,* 553 U.S. 137 (2008) —holding that a conviction for driving under the influence is not a "violent felony" under the ACCA because it "need not be purposeful or deliberate," *id.* at 145 —as "inferential" evidence that the phrase "use of physical force" can only encompass offenses involving a heightened mens rea. However, *Begay* dealt solely with the *residual clause* of the ACCA's definition of violent felony. [FN9] *Begay's* holding neither addressed nor sheds any light on the meaning of "use of physical force," a phrase which appears only in the force clause. [FN10]

> FN9. The Court took "as a given" that a driving-under-the-influence offense does not fall within the scope of the force clause. *Begay,* 553 U.S. at 141.

> FN10. For the same reason, our recent opinion in *United States v. Holloway,* 630 F.3d 252 (1st Cir.2011), in which we held that reckless offenses are not sufficiently "purposeful" to qualify as a "violent felony" under the residual clause, *id.* at 260–62; *see also Dancy,* 2011 WL 1418854, at *11, does not inform our analysis here.

Moreover, as we note above, the Supreme Court recently rejected the notion that its case law interpreting the phrase "use ... of physical force"

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.3d ----, 2011 WL 1631947 (C.A.1 (Me.))
(Cite as: 2011 WL 1631947 (C.A.1 (Me.)))

Page 8

under the ACCA would control interpretation of that phrase under § 922(g)(9). *Johnson,* 130 S.Ct. at 1273. There are sound reasons to decline to interpret the two statutes in tandem. To be sure, the ACCA and § 922(g)(9) are both animated by a protective rationale. *See Begay,* 553 U.S. at 146 ("[T]he [ACCA] focuses upon the special danger created when a particular type of offender—a violent criminal or drug trafficker—possesses a gun."); *Hartsock,* 347 F.3d at 2 ("[T]he ultimate purpose of [ § 922(g)(9) ] is to protect domestic abuse victims from the risk of further violence involving firearms."). However, the statutes address significantly different threats. Whereas the ACCA seeks to protect society at large from a diffuse risk of injury or fatality at the hands of armed, recidivist felons, § 922(g)(9) addresses an acute risk to an identifiable class of victims—those in a relationship with a perpetrator of domestic violence. As Senator Lautenberg noted:

> By their nature, acts of domestic violence are especially dangerous and require special attention. These crimes involve people who have a history together and perhaps share a home or a child. These are not violent acts between strangers, and they don't arise from a chance meeting. Even after a separation, the individuals involved, often by necessity, have a continuing relationship of some sort, either custody of children or common property ownership.

*8 142 Cong. Rec. S8831–06, S8832 (daily ed. July 25, 1996) (statement of Sen. Lautenberg). The threshold at which § 922(g)(9) will be triggered (misdemeanor crimes) is, accordingly, lower than the felony threshold set for the ACCA. *See id.* at S8831 (referring to Congress's goal of "establish[ing] a policy of zero tolerance when it comes to guns and domestic violence").

We thus end where we began, with the plain, unambiguous language of § 922(g)(9). Put simply, the statutory definition of "misdemeanor crime of domestic violence" does not prescribe an intentional mens rea. We therefore hold that an offense with a mens rea of recklessness may qualify as a "misdemeanor crime of domestic violence" under § 922(g)(9).

**B. The Rule of Lenity and the Doctrine of Constitutional Doubt**

The appellants offer two additional arguments for finding their prior convictions under Maine's assault statute insufficient to support a conviction under § 922(g)(9). First, invoking the lenity doctrine, the appellants argue that the phrase "use ... of physical force" is intractably ambiguous and must be given the interpretation most lenient to the defendant. This argument presupposes an ambiguity that has no basis in the statute's text. "[T]he rule of lenity only applies if, after considering text, structure, history, and purpose, there remains a grievous ambiguity or uncertainty in the statute such that the Court must simply guess as to what Congress intended." *Barber v. Thomas,* 130 S.Ct. 2499, 2508–09 (2010) (citations omitted) (internal quotation marks omitted). As we have held here and in *Nason,* we find no ambiguity in the phrase "use ... of physical force" when read in light of the "text, structure, history, and purpose" of § 922(g)(9), and thus the appellants' appeal to the doctrine of lenity is misplaced. *Cf. Hayes,* 129 S.Ct. at 1088–89 (rejecting application of lenity doctrine in light of finding that § 921(a)(33)(A)'s definition of "misdemeanor crime of domestic violence" is not grievously ambiguous).

Second, and in a similar vein, the appellants argue that the doctrine of constitutional doubt demands that we hold § 922(g)(9) applicable only to intentional, violent conduct and thereby avoid reaching the constitutionality of the statutory scheme. The doctrine of constitutional doubt "teaches that Congress is presumed to legislate in accordance with the Constitution and that, therefore, as between two plausible constructions of a statute, an inquiring court should avoid a constitutionally suspect one in favor of a constitutionally uncontroversial alternative." *United States v. Dwinells,* 508 F.3d 63, 70 (1st Cir.2007). This rule

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

has no application in the present case. As stated, the doctrine of constitutional doubt only comes into play when there are "two plausible constructions" of a statute; "the absence of any ambiguity defeats the constitutional avoidance argument." *Id.* As the statute here is not ambiguous, the rule does not come into play.

## IV.

*9 We turn now to the appellants' second line of argument. The appellants contend that, in light of the Supreme Court's recognition in *Heller* of an individual right to gun ownership protected by the Second Amendment, their convictions under § 922(g)(9) must be found unconstitutional. As the argument raises a constitutional challenge to a federal statute, our review is *de novo. See United States v. Rene E.,* 583 F.3d 8, 11 (1st Cir.2009). Moreover, because it is facial in nature, the appellants' challenge to the constitutionality of § 922(g)(9) must fail if we determine that the statute "has a plainly legitimate sweep." *Wash. State Grange v. Wash. State Repub. Party,* 552 U.S. 442, 449 (2008) (internal quotation marks omitted).

### A. The Decisional Framework

The Second Amendment provides: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II. In *Heller,* the Supreme Court found for the first time that this language secured an individual, and not just a collective, right to bear arms. 554 U.S. at 576–626. Though announcing a significant new understanding of the Second Amendment, the Court narrowly crafted *Heller's* actual holding. At issue in the case was the constitutionality of several firearm restrictions—most notably, a blanket ban on the ownership of handguns—enacted by the District of Columbia. *Id.* at 574–75. The Court held that, under any level of scrutiny applicable to enumerated constitutional rights,[FN11] the District's ban on handgun possession in the home "would fail constitutional muster." [FN12] *Id.* at 629. In so doing, the Court expressly left for "future evaluation" the precise level of scrutiny to be applied to laws trenching upon Second Amendment rights. *Id.* at 626, 634–35.

> FN11. The Court acknowledged that the laws at issue would survive rational-basis scrutiny, but stated that such scrutiny only applies when reviewing laws "under constitutional commands that are themselves prohibitions on irrational laws," such as the Equal Protection Clause, rather than when assessing encroachment on an enumerated right, such as was the situation in *Heller* and is the situation here. *Heller,* 554 U.S. at 628 n. 27.

> FN12. Similarly, the Court held that a provision of D.C. law requiring gun-owners to secure their guns with a trigger-lock or keep the guns disassembled unquestionably infringes upon Second Amendment rights. *Id.* at 630.

In a passage that has been the subject of much debate in the courts as well as extensive academic commentary, the Court also stated that there are limits to the Second Amendment right:

> Like most rights, the right secured by the Second Amendment is not unlimited. From Blackstone through the 19th-century cases, commentators and courts routinely explained that the right was not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose.... Although we do not undertake an exhaustive historical analysis today of the full scope of the Second Amendment, nothing in our opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms.

> *Id.* at 626–27. In an accompanying footnote,

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

the Court offered an important clarification of this passage: "We identify these presumptively lawful regulatory measures only as examples; our list does not purport to be exhaustive." *Id.* at 627 n. 26. The full significance of these pronouncements is far from self-evident. Indeed, the Court itself acknowledged that it had not left the law "in a state of utter certainty." *Id.* at 635. We thus find ourselves in agreement with the Seventh Circuit's observation, in *United States v. Skoien*, 614 F.3d 638, 640 (7th Cir.2010) (en banc), of the relative futility of "pars[ing] these passages of *Heller* as if they contain an answer to the question whether § 922(g)(9) is valid."

*10 Nonetheless, as the *Skoien* court noted, at least a couple of important points can be gleaned from this passage. First, it "tell[s] us that statutory prohibitions on the possession of weapons by some persons are proper." *Id.* That is, the Second Amendment permits categorical regulation of gun possession by classes of persons—e.g., felons and the mentally ill, *see Heller*, 554 U.S. at 626 —rather than requiring that restrictions on the right be imposed only on an individualized, case-by-case basis.

Second, the passage signals "that the legislative role did not end in 1791." *Skoien*, 614 F.3d at 640. The felony firearm disqualification, which numbers among *Heller's* list of "presumptively lawful" measures, presents a case in point. Though there may be some historical predicates for restricting the gun rights of those who have been convicted of a crime,[FN13] *see id.; cf. Rene E.*, 583 F.3d at 15–16 (discussing evidence that Founders considered the gun right to be limited to those who could exercise it in a virtuous manner), the modern federal felony firearm disqualification law, 18 U.S.C. § 922(g)(1), is firmly rooted in the twentieth century and likely bears little resemblance to laws in effect at the time the Second Amendment was ratified. [FN14] Indeed, the current federal felony firearm ban differs considerably from the version of the proscription in force just half a century ago. Enacted in its earliest incarnation as the Federal Firearms Act of 1938, the law initially covered those convicted of a limited set of violent crimes such as murder, rape, kidnapping, and burglary, but extended to both felons and misdemeanants convicted of qualifying offenses. *See* Federal Firearms Act, ch. 850, §§ 1(6), 2(f), 52 Stat. 1250, 1250–51 (1938); *Skoien*, 614 F.3d at 640. The law was expanded to encompass all individuals convicted of a felony (and to omit misdemeanants from its scope) several decades later, in 1961. *See* An Act to Strengthen the Federal Firearms Act, Pub.L. No. 87–342, § 2, 75 Stat. 757, 757 (1961).

FN13. We note that the historical pedigree of laws disarming those convicted of a crime is subject to substantial debate among scholars. *See, e.g.,* Don B. Kates, *A Modern Historiography of the Second Amendment,* 56 UCLA L.Rev. 1211, 1231 n. 100 (2009) ("[T]here is ample historical support for excluding [felons] from the right to arms: Nations which accepted the right to arms invariably extended that right only to virtuous citizens; and at common law felons were 'civilly dead,' having lost all rights including the right to possess property of any kind."); C. Kevin Marshall, *Why Can't Martha Stewart Have a Gun?,* 32 Harv. J.L. & Pub. Pol'y 695, 714 (2009) (surveying early American authorities interpreting the Second Amendment as well as English antecedents and concluding that they "point against lifetime total disarmament of all 'felons' "); Adam Winkler, *Heller's Catch–22,* 56 UCLA L.Rev. 1551, 1563 (2009) ("The Founding generation had no laws limiting gun possession by the mentally ill, nor laws denying the right to people convicted of crimes. Bans on ex-felons possessing firearms were first adopted in the 1920s and 1930s, almost a century and a half after the Founding." (footnote omitted)); Carlton F.W. Larson, *Four Exceptions in Search of*

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.3d ----, 2011 WL 1631947 (C.A.1 (Me.))
(Cite as: 2011 WL 1631947 (C.A.1 (Me.)))

a Theory: District of Columbia v. Heller and Judicial Ipse Dixit, 60 Hastings L.J. 1371, 1376 (2009) (concluding that "felon disarmament laws significantly postdate both the Second Amendment and the Fourteenth Amendment"); Glenn Harlan Reynolds, *A Critical Guide to the Second Amendment,* 62 Tenn. L.Rev. 461, 480 (1995) (noting that, at the time of the Founding, "felons, children, and the insane were excluded from the right to arms precisely as (and for the same reasons) they were excluded from the franchise").

FN14. The law, 18 U.S.C. § 922(g)(1), applies to all individuals convicted of a federal felony, thus encompassing individuals convicted of crimes as disparate as tax evasion, *see* 26 U.S.C. § 7201, and bank robbery, *see* 18 U.S.C. § 2113. This breadth, and particularly the inclusion of nonviolent offenses, constitutes a significant departure from earlier understandings of a "felony." At common law, for example, "[o]nly the most serious crimes" were considered to be felonies, leaving even grievous offenses such as kidnapping and assault with intent to rape classified as misdemeanors. *United States v. Watson,* 423 U.S. 411, 439–440 (1976) (Marshall, J., dissenting).

The recency of enactment and the continuing evolution of this "presumptively lawful" limit on gun ownership support the conclusion that, "although the Justices have not established that any particular statute is valid, ... exclusions need not mirror limits that were on the books in 1791." [FN15] *Skoien,* 614 F.3d at 641. Nor can it be that the relative age of a regulation is the key to its constitutionality. As the Seventh Circuit has observed, "[i]t would be weird to say that § 922(g)(9) is unconstitutional [at this time] but will become constitutional by 2043, when it will be as 'longstanding' as § 922(g)(1) was when the Court decided *Heller.*" *Id.*

FN15. Of course, evidence of historical attitudes towards and regulation of firearms are relevant to a law's constitutionality. In *Rene E.,* for example, we looked closely at the history of restrictions on possession of guns by juveniles in holding constitutional 18 U.S.C. § 922(x)(1), which prohibits juvenile handgun possession. 583 F.3d at 13–16. Our decision in *Rene E.* should not be taken to suggest, however, that a law may only be found constitutional by reference to its historical provenance.

Indeed, § 922(g)(9) fits comfortably among the categories of regulations that *Heller* suggested would be "presumptively lawful." 554 U.S. at 627 n. 26. Section 922(g)(9) is, historically and practically, a corollary outgrowth of the federal felon disqualification statute.[FN16] Moreover, in covering only those with a record of violent crime, § 922(g)(9) is arguably more consistent with the historical regulation of firearms than § 922(g)(1), which extends to violent and nonviolent offenders alike. *See* C. Kevin Marshall, *Why Can't Martha Stewart Have a Gun?,* 32 Harv. J.L. & Pub. Pol'y 695, 698 (2009) ("[A]ctual 'longstanding' precedent in America and pre-Founding England suggests that a firearms disability can be consistent with the Second Amendment to the extent that ... its basis credibly indicates a present danger that one will misuse arms against others and the disability redresses that danger."). As *Skoien* notes, this extension of the felon firearm ban to non-violent offenders renders it "difficult to condemn § 922(g)(9), which like the 1938 Act is limited to violent crimes." 614 F.3d at 641.

FN16. As the Supreme Court noted in *Hayes,* the Lautenberg Amendment "extended" the existing felon disqualification to individuals convicted of a misdemeanor crime of domestic violence. 129 S.Ct. at 1082. The legislative history of the provision makes plain that the Lautenberg Amendment was specifically intended to

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.3d ----, 2011 WL 1631947 (C.A.1 (Me.))
(Cite as: 2011 WL 1631947 (C.A.1 (Me.)))

remedy a failure of the felon disqualification scheme—namely, that it omitted from its sweep a class of criminals who posed a significant and particularized danger to those around them. *See* 142 Cong. Rec. S10379, S10380 (daily ed. Sept. 12, 1996) (statement of Senator Feinstein) (explaining that the Lautenberg Amendment was meant to "close th[e] dangerous loophole" that allowed domestic abusers charged with lesser offenses to escape firearm disqualification under § 922(g)(1)).

*11 While the categorical regulation of gun possession by domestic violence misdemeanants thus appears consistent with *Heller's* reference to certain presumptively lawful regulatory measures, we agree with the Seventh Circuit's conclusion in *Skoien* that some sort of showing must be made to support the adoption of a new categorical limit on the Second Amendment right. *Id.* The Court made plain in *Heller* that a rational basis alone would be insufficient to justify laws burdening the Second Amendment. 554 U.S. at 628 n. 27. The parties here champion competing standards: the appellants argue that strict scrutiny is required, because § 922(g)(9) infringes upon the "core" constitutional right recognized in *Heller* to "possess firearms in the home," FN17 whereas the government urges that we adopt intermediate scrutiny (while asserting that the law would survive more stringent review). We think it sufficient to conclude, as did the Seventh Circuit, that a categorical ban on gun ownership by a class of individuals must be supported by some form of "strong showing," necessitating a substantial relationship between the restriction and an important governmental objective. *Skoien*, 614 F.3d at 641.

> FN17. While we do not attempt to discern the "core" Second Amendment right vindicated in *Heller,* we note that *Heller* stated that the Second Amendment "elevates above all other interests the right of law-abiding, responsible citizens to use arms in defense of hearth and home." 554 U.S. at 635. We would question whether appellants, who manifestly are not "law-abiding, responsible citizens," fall within this zone of interest.

**B. Constitutionality of § 922(g)(9)**

Section 922(g)(9) finds its animating interest in keeping guns away from people who have been proven to engage in violence with those with whom they share a domestically intimate or familial relationship, or who live with them or the like. This interest, which appears plainly on the face of the statute and is borne out by its legislative history, *see* 142 Cong. Rec. S8832 (statement of Sen. Lautenberg), is undeniably important. *See Skoien,* 614 F.3d at 642 ("[N]o one doubts that the goal of § 922(g)(9), preventing armed mayhem, is an important governmental objective."); *cf. Carey v. Brown,* 447 U.S. 455, 471 (1980) ("The State's interest in protecting the well-being, tranquility, and privacy of the home is certainly of the highest order in a free and civilized society."). The appellants raise no serious argument to the contrary.

Nor can there be any question that there is a substantial relationship between § 922(g)(9)'s disqualification of domestic violence misdemeanants from gun ownership and the governmental interest in preventing gun violence in the home. Statistics bear out the Supreme Court's observation that "[f]irearms and domestic strife are a potentially deadly combination nationwide." *Hayes,* 129 S.Ct. at 1087. According to figures collected by the Justice Department and included in the record here, nearly 52,000 individuals were murdered by a domestic intimate between 1976 and 1996, and the perpetrator used a firearm in roughly 65% of the murders (33,500). The risk of fatality from an assault involving a firearm is far greater than that associated with other weapons. *See Skoien,* 614 F.3d at 642–43 (discussing studies finding that an assault with a gun is five times more deadly than an assault with a knife, and that domestic assaults with guns are twelve times as likely to result in fatality than

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

assaults with knives or fists).

**\*12** Not surprisingly, research has found that "[t]he presence of a gun in the home of a convicted domestic abuser is 'strongly and independently associated with an increased risk of homicide.'" *Id.* at 643–44 (quoting Arthur L. Kellerman, et al., *Gun Ownership as a Risk Factor for Homicide in the Home,* 329 New Eng. J. Med. 1084, 1087 (1993)). It follows that removing guns from the home will materially alleviate the danger of intimate homicide by convicted abusers.[FN18] And, as the Seventh Circuit has noted, the fact that the recidivism rate for domestic violence is high suggests that there are "substantial benefits in keeping the most deadly weapons out of the hands of domestic abusers." *Id.* at 644 (surveying studies estimating overall domestic violence recidivism rate to be between 35% and 80%).

> FN18. Moreover, the risk of homicide extends beyond those in an intimate relationship with the abuser. As the Seventh Circuit notes in *Skoien,* "[r]esponding to a domestic-disturbance call is among an officer's most risky duties." 614 F.3d at 644. Between 2000 and 2009, close to 8% of non-accidental law enforcement officer fatalities in the line of duty were related to domestic disturbance calls. Federal Bureau of Investigation, *Law Enforcement Officers Killed and Assaulted 2009* Table 19 (2010).

In light of the above, it is plain that § 922(g)(9) substantially promotes an important government interest in preventing domestic gun violence. We thus reject the appellants' Second Amendment challenge to the law.

*Affirmed.*

C.A.1 (Me.),2011.
U.S. v. Booker
--- F.3d ----, 2011 WL 1631947 (C.A.1 (Me.))

END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.