1  BENJAMIN B. WAGNER
   United States Attorney
2  EDWARD A. OLSEN, CSBN 214150
   Assistant United States Attorney
3  501 I Street, Suite 10-100
   Sacramento, California  95814
4  Telephone: (916) 554-2821
   Facsimile:  (916) 554-2900
5  Email: edward.olsen@usdoj.gov

6  Attorneys for Federal Defendants

7

8              IN THE UNITED STATES DISTRICT COURT

9            FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11 RICHARD ENOS, JEFF BASTASINI,          CASE NO.  2:10-cv-02911-JAM-EFB
   LOUIE MERCADO, WALTER GROVES,
12 MANUEL MONTEIRO, EDWARD
   ERIKSON, VERNON NEWMAN,                 NOTICE OF ADDITIONAL
13                                         AUTHORITY
                    Plaintiffs,
14
   v.                                      Date:    January 25, 2012
15                                         Time:    9:30 a.m.
   ERIC HOLDER, as United States Attorney  Place:   Courtroom 6, 14th Floor
16 General, and ROBERT MUELLER, III, as    Judge:   Honorable John A. Mendez
   Director of the Federal Bureau of Investigation,
17
                    Defendants.
18

19
20          Defendants hereby notify the Court of a recent opinion from the United States Court of Appeals

21  for the Fourth Circuit rejecting an as-applied Second Amendment challenge to 18 U.S.C. § 922(g)(9) –

22  *United States v. Staten*, ___ F.3d ___, 2011 WL 6016976 (4th Cir. Dec. 5, 2011).  A copy of the opinion

    is attached as Exhibit A.

23          Defendants also hereby notify the Court that Chief Judge Kozinski issued an Order on

24  November 28, 2011, ordering that *Nordyke v. King*, 644 F.3d 776 (9th Cir. 2011) – a case cited by the

25  parties in their supplemental briefs on the government's motion to dismiss the First Amended

26  Complaint in this case – be reheard en banc pursuant to Circuit Rule 35-3.  *See Nordyke v. King*, ___

27  F.3d ___, 2011 WL 5928130 (9th Cir. Nov, 28, 2011).  A copy of Chief Judge Kozinski's order is

28

NOTICE OF ADDITIONAL AUTHORITY

                                    1

1    attached as Exhibit B.

2

3                                          Respectfully submitted,

4    DATED: December 6, 2011               BENJAMIN B. WAGNER
                                           United States Attorney

5
                                   By:     _/s/ Edward A. Olsen_____
6                                          EDWARD A. OLSEN
                                           Assistant United States Attorney

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT A

PUBLISHED

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

v.

MARK A. STATEN,

*Defendant-Appellant.*

No. 10-5318

Appeal from the United States District Court
for the Southern District of West Virginia, at Charleston.
John T. Copenhaver, Jr., District Judge.
(2:09-cr-00235-1)

Argued: September 23, 2011

Decided: December 5, 2011

Before AGEE and WYNN, Circuit Judges, and
HAMILTON, Senior Circuit Judge.

Affirmed by published opinion. Senior Judge Hamilton wrote
the opinion, in which Judge Agee and Judge Wynn joined.

## COUNSEL

**ARGUED:** Christian M. Capece, OFFICE OF THE FED-
ERAL PUBLIC DEFENDER, Charleston, West Virginia, for
Appellant. Elizabeth Dorsey Collery, UNITED STATES
DEPARTMENT OF JUSTICE, Washington, D.C., for Appel-

lee. **ON BRIEF:** Mary Lou Newberger, Federal Public Defender, Jonathan D. Byrne, OFFICE OF THE FEDERAL PUBLIC DEFENDER, Charleston, West Virginia, for Appellant. R. Booth Goodwin II, United States Attorney, Charleston, West Virginia, Lisa G. Johnston, Assistant United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Huntington, West Virginia; Lanny A. Breuer, Assistant Attorney General, Greg D. Andres, Acting Deputy Assistant Attorney General, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellee.

---

## OPINION

HAMILTON, Senior Circuit Judge:

Section 922(g)(9) of Title 18 of the United States Code prohibits a person who has been convicted of a misdemeanor crime of domestic violence from possessing, shipping, or receiving a firearm in or affecting interstate commerce. 18 U.S.C. § 922(g)(9). The sole issue on appeal is whether Mark Staten's conviction on one count of violating § 922(g)(9) survives his as-applied constitutional challenge under the Second Amendment, U.S. Const. amend. II. For reasons that follow, we affirm the judgment of the district court.

I

Late in the evening on April 7, 2009, two deputy sheriff officers responded to a domestic disturbance call from Staten's wife. Upon arriving at the Statens' home, Staten's wife reported that she and her husband had been arguing for two days; that she feared for her safety due to his drinking; and that there were three rifles hanging on the wall in the living room.[1] At the request of the officers, Staten entered the living

---

[1] Actually, there were two rifles and one shotgun.

room. Staten thereafter admitted to having been convicted of misdemeanor domestic assault, which the officers were able to confirm while still on the scene. The officers then seized the three firearms and arrested Staten for being a prohibited person in possession of a firearm in violation of § 922(g)(9).

Staten was indicted on one count of knowingly possessing three firearms following a misdemeanor conviction for domestic violence, in violation of §§ 922(g)(9) and 924(a)(2). He subsequently moved to dismiss the indictment on the ground that § 922(g)(9) violated his right to bear arms in defense of his home under the Second Amendment to the United States Constitution. Staten initially brought his Second Amendment challenge as a facial challenge alleging substantial overbreadth and as an as-applied challenge. The government opposed the motion. Both sides filed multiple memorandums in support of their respective positions, with the government offering quotations and citations to scholarly social science evidence in its filings. We glean from the record that the district court did not conduct an evidentiary hearing on Staten's motion to dismiss because Staten never requested one.

After the district court denied Staten's motion to dismiss, *see United States v. Staten*, 2010 WL 3476110 (S.D. W.Va. Sept. 2, 2010), Staten entered a conditional plea of guilty to violation of § 922(g)(9), as alleged in the single-count indictment, pursuant to a plea agreement that reserved his right to appeal the district court's denial of his motion to dismiss. *See* Fed. R. Crim. P. 11(a)(2). Pursuant to Exhibit A of the plea agreement, entitled *"STIPULATION OF FACTS*," the government and Staten "stipulate[d] and agree[d]," *inter alia*, that: (1) prior to April 7, 2009, he had been convicted of three misdemeanor crimes of domestic violence, as defined in 18 U.S.C. § 921(a)(33); (2) his wife Angela was the victim of all three crimes; (3) his right to possess a firearm had not been restored; (4) on April 7, 2009, he told a deputy that he knew that he was not to be in possession of any firearms; and (5)

he knowingly possessed ammunition which could be fired from the firearms found hanging on the wall of his living room on April 7, 2009. (J.A. 234).

The district court sentenced Staten to nine and one-half months of imprisonment, to be followed by three years of supervised release. Staten timely noted the present appeal in which he continues to press his as-applied challenge to his § 922(g)(9) conviction under the Second Amendment.[2]

## II

We review *de novo* the district court's rejection of Staten's as-applied Second Amendment challenge to § 922(g)(9). *See United States v. Malloy*, 568 F.3d 166, 171 (4th Cir. 2009) ("This court reviews a challenge to the constitutionality of a federal statute *de novo*."), *cert. denied*, 130 S. Ct. 1736 (2010).

## A

We begin our consideration of Staten's as-applied challenge to his § 922(g)(9) conviction under the Second Amendment by setting forth the legal principles relevant to our analysis. The Second Amendment provides: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. Amend. II. In *District of Columbia v.*

---

[2]Staten does not press his facial challenge to § 922(g)(9) under the Second Amendment in his opening brief. Accordingly, he has abandoned such challenge for purposes of the present appeal. *See* Fed. R. App. P. 28(a)(9)(A) ("appellant's brief must contain . . . appellant's contentions and the reasons for them, with citations to the authorities and parts of the record on which the appellant relies . . ."); *United States v. Al–Hamdi*, 356 F.3d 564, 571 n.8 (4th Cir. 2004) ("It is a well settled rule that contentions not raised in the argument section of the opening brief are abandoned."); *Yousefi v. INS*, 260 F.3d 318, 326 (4th Cir. 2001) (failure to raise issue in opening appellate brief results in abandonment of that issue on appeal).

*Heller*, 554 U.S. 570 (2008), the Supreme Court held for the first time that the right to keep and bear arms, as provided in the Second Amendment, is an individual right without regard to militia service. *Id.* at 595. According to the Court, the core right of the Second Amendment is "the right of law-abiding, responsible citizens to use arms in defense of hearth and home." *Id.* at 635. Based upon this holding, the Court invalidated District of Columbia laws banning the possession of handguns and requiring citizens to keep firearms in inoperable condition. *Id.* The Court was careful to note, however, that the right to keep and bear arms under the Second Amendment is not unlimited, and that its holding did not invalidate "presumptively lawful regulatory measures," *id.* at 627 n.26, such as "longstanding prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms," *id.* at 626-27.

Post *Heller*, we first considered the constitutionality of § 922(g)(9) under the Second Amendment in an unpublished opinion in *United States v. Chester* (*Chester I*), 367 F. App'x. 392 (4th Cir. 2010) (*per curiam*). In *Chester I*, we vacated William Chester's § 922(g)(9) conviction and remanded his "appeal for clarification of the precise contours of his Second Amendment claim—a necessary step in determining the appropriate standard of constitutional scrutiny to apply—and for development of the record under the appropriate means-end framework." *United States v. Chester* (*Chester II*), 628 F.3d 673, 678 (4th Cir. 2010). Notably, we did not identify the appropriate level of scrutiny in *Chester I*, "leaving that task to the district court on remand." *Id.* at 678. Moreover, agreeing with the Seventh Circuit's panel decision in *United States v. Skoien* (*Skoien I*), 587 F.3d 803 (7th Cir. 2009), *vacated*, 614 F.3d 638 (7th Cir. 2010) (*en banc*), we expressly rejected the government's argument that § 922(g)(9) was valid by analogy based on *Heller*'s "'presumptively lawful'" language. *Chester I*, 367 F. App'x. at 393.

After we issued *Chester I*, the government petitioned for panel rehearing in light of the fact that the *Skoien I* panel decision had been vacated by the Seventh Circuit sitting *en banc*. *Chester II*, 628 F.3d at 678. Thereafter, the Seventh Circuit issued its *en banc* decision in *Skoien*, *see United States v. Skoien (Skoien II)*, 614 F.3d 638 (7th Cir. 2010) (*en banc*), rejecting a Second Amendment challenge to § 922(g)(9) on the basis that logic and data demonstrate a substantial relationship between § 922(g)(9) and an important governmental objective. *See Skoien II*, 614 F.3d at 642.

Subsequently, in a published opinion we refer to in the present opinion as *Chester II*, we granted the government's petition for panel rehearing, vacated *Chester I*, and reissued our decision in order to provide district courts in the Fourth Circuit with guidance on the proper framework for deciding as-applied Second Amendment challenges. *Chester II*, 628 F.3d at 678. In this regard, we specifically announced a two-part approach. *Id.* at 680. The first part asks "whether the challenged law imposes a burden on conduct falling within the scope of the Second Amendment's guarantee." *Id.* (internal quotation marks omitted). Putting meat on the bones of this question, we explained that it is a "historical inquiry" that "seeks to determine whether the conduct at issue was understood to be within the scope of the right at the time of ratification." *Id.* If the challenged law does not impose a burden on conduct falling within the scope of the Second Amendment's guarantee as historically understood, that is the end of the matter. *Id.* However, if the challenged law does impose a burden on conduct falling within the scope of the Second Amendment's guarantee as historically understood, then the second part of the two-part approach comes into play. *Id.*

The second part of the two-part approach involves application of the appropriate form of means-end scrutiny. *Id.* In *Chester II*, we held that intermediate scrutiny is the appropriate standard to analyze a challenge to § 922(g)(9) under the

Second Amendment.[3] *Chester II*, 628 F.3d at 683. Under the formulation of intermediate scrutiny that we adopted in *Chester II*, the government bears the burden of showing "a reasonable fit between the challenged regulation and a substantial government objective." *Id.* at 683 (internal quotation marks omitted); *see also id.* ("[I]ntermediate scrutiny places the burden of establishing the required fit squarely upon the government."). In meeting its burden under intermediate scrutiny, the government is not required to show the regulation is "the least intrusive means of achieving the relevant government objective, or that there be no burden whatsoever on the individual right in question." *United States v. Masciandaro*, 638 F.3d 458, 474 (4th Cir. 2011).

Applying this two-part approach in *Chester II*, we first asked whether the possession of a firearm in the home by a domestic violence misdemeanant is protected by the Second Amendment as historically understood. *Chester II*, 628 F.3d at 680. Notably, the government did not take the position in *Chester II*, as they do in the present appeal, that persons convicted of misdemeanors involving domestic violence were altogether excluded from the Second Amendment as it was understood by the founding generation. *Id.* at 680-81. Based upon this and the lack of historical evidence on the issue in the appellate record, we were unable to say in *Chester II* that the Second Amendment, as historically understood, did not apply to persons convicted of domestic violence misdemeanors. *Id.* at 681. Under such circumstance, we held that "[w]e must assume . . . that Chester's Second Amendment rights are intact and that he is entitled to some measure of Second Amendment protection to keep and possess firearms in his home for self-defense." *Id.* at 681-82.

---

[3]We held that strict scrutiny did not apply because Chester's criminal history as a domestic violence misdemeanant took him outside the core right of the Second Amendment identified in *Heller*, which is the right of a law-abiding responsible citizen to possess and carry a weapon for self-defense. *Chester II*, 628 F.3d at 682.

Accordingly, we proceeded to apply intermediate scrutiny. We were quickly stopped in our tracks, however, by the understandably undeveloped record. On this point, we explained:

> We cannot conclude on this record that the government has carried its burden of establishing a reasonable fit between the important object of reducing domestic gun violence and § 922(g)(9)'s permanent disarmament of all domestic-violence misdemeanants. The government has offered numerous plausible *reasons* why the disarmament of domestic violence misdemeanants is substantially related to an important government goal; however, it has not attempted to offer sufficient *evidence* to establish a substantial relationship between § 922(g)(9) and an important governmental goal. Having established the appropriate standard of review, we think it best to remand this case to afford the government an opportunity to shoulder its burden and Chester an opportunity to respond. Both sides should have an opportunity to present their evidence and their arguments to the district court in the first instance.

*Chester II*, 628 F.3d at 683. As we file the present opinion, *Chester* remains pending in the district court for the Southern District of West Virginia on remand.

B

Having set forth the relevant legal principles, we now turn to analyze Staten's as-applied challenge under the Second Amendment to his § 922(g)(9) conviction. We first note that although Staten expressly concedes in his opening appellate brief that, under *Chester II*, intermediate scrutiny is the appropriate standard for analyzing his as-applied challenge under the Second Amendment to his § 922(g)(9) conviction, he nonetheless devotes a large portion of his brief to his argu-

ment that strict scrutiny is the appropriate standard in order to preserve such argument for further appellate review. Because we are bound by *Chester II*, we do not address this argument further. *See Jones v. Angelone*, 94 F.3d 900, 905 (4th Cir. 1996) (panel may not overrule decision of prior panel in same circuit; only *en banc* court may overrule prior panel decision).

On appeal, the government first defends Staten's § 922(g)(9) conviction on the basis that § 922(g)(9) is presumptively lawful under *Heller*. The government promptly acknowledges, however, that we rejected this exact argument in *Chester II*, 628 F.3d at 679, but explains that it nonetheless presented it in the event of further appellate review. Again, we are bound by *Chester II*, and thus reject the government's argument that § 922(g)(9) is presumptively lawful under *Heller*. *Jones*, 94 F.3d at 905.

Next, in contrast to the government's litigation position in *Chester II*, the government here seeks to defend the constitutionality of Staten's § 922(g)(9) conviction on the basis that, according to the government, persons convicted of domestic violence misdemeanors were altogether excluded from the Second Amendment as it was understood by the founding generation. The government cites laws from England and the colonies prior to the American Revolution in support of this proposition. Staten, for his part, opposes this argument on the merits and, alternatively, contends the government is now precluded from raising such argument by failing to raise it in *Chester II*.

We conclude that delving into any of this multi-level debate under the first part of the *Chester II* approach is unnecessary. This is so because, assuming *arguendo* that Staten's Second Amendment rights are intact and that he is entitled to some measure of Second Amendment protection to keep and possess firearms in his home for self-defense, our following analysis leads us to conclude that the government has carried its burden under intermediate scrutiny pursuant to the second

part of the *Chester II* approach. *See Masciandaro*, 638 F.3d at 473-76 (upholding regulatory prohibition on carrying or possessing loaded handgun in motor vehicle within national park area against Second Amendment challenge by assuming *arguendo* existence of Second Amendment right to possess a loaded handgun for self-defense outside the home, but applying intermediate scrutiny and holding challenged regulation survived it).

The net effect of our winnowing of the various opposing arguments just outlined is that this case picks up where *Chester II* left off; we must consider whether the government has carried its burden of establishing that § 922(g)(9) survives intermediate scrutiny. Under the intermediate scrutiny standard, the government bears the burden of establishing a reasonable fit between § 922(g)(9) and a substantial governmental objective. *Chester II*, 628 F.3d at 683. We note that although our published opinion in *Chester II* had not yet issued at the time the district court denied Staten's motion to dismiss his indictment based upon the Second Amendment, the district court applied intermediate scrutiny in essentially the same formulation as we subsequently adopted in *Chester II* in rejecting Staten's as-applied Second Amendment challenge.[4] *See United States v. Staten*, 2010 WL 3476110 at *4-5.

The government identifies reducing domestic gun violence as the substantial governmental objective of § 922(g)(9). Section 922(g)(9)'s legislative history directly supports this posi-

---

[4]In response to our decision in *Chester I*, the district court in this case ordered the parties to respond to the issues raised in that opinion. The government's filings pursuant to that order placed before the district court scholarly studies and related items it also references on appeal. Staten did not object to the government's method of placing this information before the district court, provided no rebuttal evidence, and did not request a hearing. In reaching its decision, the district court relied on much of the scholarly studies referenced by the government which are discussed herein.

tion. *See United States v. Hayes*, 555 U.S. 415, 426 (2009) (noting that legislative history of § 922(g)(9) indicates that it was passed in response to Congress' concern that existing felon-in-possession laws were not keeping firearms out of the hands of domestic abusers because many people who engage in serious spousal or child abuse ultimately were not charged with or convicted of felonies and that the statute was designed to close this dangerous loophole). Moreover, common sense and case law fully support the government's position, which position Staten does not contest. As the First Circuit recently held, "keeping guns away from people who have been proven to engage in violence with those whom they share a domestically intimate or familial relationship . . . is undeniably important." *United States v. Booker*, 644 F.3d 12, 25 (1st Cir. 2011); *see also Hayes*, 555 U.S. at 426-27 ("Construing § 922(g)(9) to exclude the domestic abuser convicted under a generic use-of-force statute (one that does not designate a domestic relationship as an element of the offense) would frustrate Congress' manifest purpose. Firearms and domestic strife are a potentially deadly combination nationwide."); *Skoien II*, 614 F.3d at 642 ("no one doubts that the goal of § 922(g)(9), preventing armed mayhem, is an important governmental objective"). Based upon § 922(g)(9)'s legislative history, the relevant case law, and common sense, we hold that the government has carried its burden of establishing that reducing domestic gun violence is a substantial government objective.

Moving on to the "reasonable fit" portion of intermediate scrutiny, we note that in establishing a reasonable fit between § 922(g)(9) and the substantial government objective of reducing domestic gun violence, the government is not required to prove that § 922(g)(9) is the least intrusive means of reducing domestic gun violence or that there be no burden whatsoever on Staten's assumed *arguendo* right under the Second Amendment to keep and bear arms in his home for self-defense. *See Masciandaro*, 638 F.3d at 474 ("intermediate scrutiny does not require that a regulation be

the least intrusive means of achieving the relevant government objective, or that there be no burden whatsoever on the individual right in question"). In other words, the fit needs to be reasonable; a perfect fit is not required. *See Chester II*, 628 F.3d at 683 (citing with approval *United States v. Marzzarella*, 614 F.3d 85, 98 (3d Cir. 2010), for proposition that intermediate scrutiny requires "fit between the challenged regulation and the asserted objective be reasonable, not perfect").

We begin our reasonable fit inquiry by considering the precise contours of § 922(g)(9). Pursuant to § 922(g)(9),

> [i]t shall be unlawful for any person— . . . who has been convicted in any court of a misdemeanor crime of domestic violence, to ship or transport in interstate commerce, or possess in or affecting commerce, any firearm or ammunition; or to receive any firearm or ammunition which has been shipped or transported in interstate or foreign commerce.

18 U.S.C. § 922(g)(9). For purposes of § 922(g)(9), the term "misdemeanor crime of domestic violence" is defined as follows:

> (A) [T]he term "misdemeanor crime of domestic violence" means an offense that—
>
> > (i) is a misdemeanor under Federal, State, or Tribal law; and
> >
> > (ii) *has, as an element, the use or attempted use of physical force, or the threatened use of a deadly weapon,* committed by a current or former spouse, parent, or guardian of the victim, by a person with whom the victim shares a child in common, by a person who is cohabitating with or has cohabited with the victim as a spouse, parent, or guardian,

or by a person similarly situated to a
spouse, parent, or guardian of the victim.

18 U.S.C. § 921(a)(33)(A) (emphasis added). In *United States
v. White*, 606 F.3d 144 (4th Cir. 2010), we held that the term
"physical force," as used in § 921(a)(33)(A)(ii), means "force
capable of causing physical pain or injury to another person."
*White*, 606 F.3d at 153 (internal quotation marks omitted).
Therefore, a "misdemeanor crime of domestic violence," for
purposes of a § 922(g)(9) offense, is one in which the use or
attempted use of force capable of causing physical pain or
injury to another or the threatened use of a deadly weapon is
an element of the offense.

Accordingly, the question we must resolve under the rea-
sonable fit inquiry is whether the government has carried its
burden of establishing a reasonable fit between the substantial
governmental objective of reducing domestic gun violence
and the keeping of firearms out of the hands of: (1) persons
who have been convicted of a crime in which the person used
or attempted to use force capable of causing physical pain or
injury to another against a spouse, former spouse, or other
person with whom such person had a domestic relationship
specified in § 921(a)(33)(A)(ii); and (2) persons who threat-
ened use of a deadly weapon against such persons. In resolv-
ing this question, we first observe that § 921(a)(33)(A)'s
definition of the term "misdemeanor crime of domestic vio-
lence," as construed in *White*, 606 F.3d at 155, keeps
§ 922(g)(9)'s prohibitory sweep narrow. For example,
§ 922(g)(9) does not apply to persons convicted of a misde-
meanor for using or attempting to use force against a spouse
which is incapable of causing physical pain or injury to
another, such as an offensive touching in a common law bat-
tery. *See White*, 606 F.3d at 153. For a second example,
§ 922(g)(9) does not apply to persons convicted of a misde-
meanor for threatening the use of a non-deadly weapon
against a spouse. *See* § 921(a)(33)(A)(ii). We also observe
that § 921(a)(33)(B) imposes important safeguards on the

application of § 922(g)(9), such as the safeguard that a person shall not be considered to have been convicted of a domestic violence misdemeanor "unless . . . the person was represented by counsel in the case, or knowingly and intelligently waived the right to counsel in the case . . . ." § 921(a)(33)(B)(i)(I). Finally, we observe that § 922(g)(9)'s prohibitory sweep is further narrowed by the fact that, for purposes of § 922(g)(9), a person shall not be considered to have been convicted of a domestic violence misdemeanor

> if the conviction has been expunged or set aside, or
> is an offense for which the person has been pardoned
> or has had civil rights restored (if the law of the
> applicable jurisdiction provides for the loss of civil
> rights under such an offense) unless the pardon,
> expungement, or restoration of civil rights expressly
> provides that the person may not ship, transport, pos-
> sess, or receive firearms.

18 U.S.C. § 921(a)(33)(B)(ii).

With the narrowness of § 922(g)(9)'s prohibitory sweep in mind, we turn to evaluate the evidence offered by the government in support of its reasonable fit burden. Specifically, the government bears the burden of establishing a reasonable fit between the substantial government objective of reducing domestic gun violence and keeping firearms out of the hands of persons (1) who have been convicted of a crime in which the person used or attempted to use force capable of causing physical pain or injury to another against a spouse, former spouse, or other person with whom such person had a domestic relationship specified in § 921(a)(33)(A)(ii) or (2) who have threatened the use of a deadly weapon against such a person. To carry its burden, the government primarily relies upon empirical evidence garnered from social science studies, the results of which and conclusions drawn therefrom appear in scholarly social science reports (also commonly referred to as articles).

The government starts its reasonable fit analysis with identifying the scope of the problem to indicate its magnitude. Specifically, the government starts with what it characterizes as the well-settled proposition that domestic violence is a serious problem in the United States. In support, the government cites findings from a July 2000 social science research report cosponsored by the National Institute of Justice[5] and the Centers for Disease Control. *See* U.S. Dept. of Justice, National Institute of Justice, Patricia Tjaden and Nancy Thoennes, *Extent, Nature, and Consequences of Intimate Partner Violence: Findings From the National Violence Against Women Survey* iii, NCJ 181867 (July 2000), available at https://www.ncjrs.gov/pdffiles1/nij/181867.pdf. The report presented findings from the National Violence Against Women Survey on the extent, nature, and consequences of intimate partner violence in the United States. *Id.* at iii. The survey consisted of telephone interviews with a nationally representative sample of 8,000 women and 8,000 men. *Id.* Of particular relevance here, the report stated that nearly 25% of the 8,000 women surveyed and 7.6% of the 8,000 men surveyed "said they were raped and/or physically assaulted by a current or former spouse, cohabitating partner, or date at some time in their lifetime." *Id.* The report further stated that "1.5 percent of surveyed women and 0.9 percent of surveyed men said they were raped and/or physically assaulted by a partner in the previous 12 months." *Id.* Based upon these survey results, the report concluded that

> approximately 1.5 million women and 834,732 men are raped and/or physically assaulted by an intimate partner annually in the United States. Because many victims are victimized more than once, the number of intimate partner victimizations exceeds the number of intimate partner victims annually. Thus, approximately 4.8 million intimate partner rapes and

---

[5]The National Institute of Justice is a component of the United States Department of Justice's Office of Justice Programs.

physical assaults are perpetrated against U.S. women
annually, and approximately 2.9 million intimate
partner physical assaults are committed against U.S.
men annually. *These findings suggest that intimate
partner violence is a serious criminal justice and
public health concern.*

*Id.* (emphasis added).

We recognize that this scholarly social science report is one
among many which have reached the same conclusion, *i.e,*
that domestic violence presents a serious problem in the
United States. Indeed, the Supreme Court has cited such
reports in support of its express recognition in 2006 that
domestic abuse is a serious problem in the United States. *See
Georgia v. Randolph*, 547 U.S. 103, 117 (2006) (recognizing
"that domestic abuse is a serious problem in the United
States" in reliance on, *inter alia*, U.S. Dept. of Justice,
National Institute of Justice, Patricia Tjaden and Nancy
Thoennes, *Full Report of the Prevalence, Incidence, and Con-
sequences of Violence Against Women* 25-26 (2000)). Staten
wisely does not dispute the unfortunately indisputable propo-
sition that domestic violence is a serious problem in the
United States. We hold the government has so established.

Moving on, the government asserts that empirical evidence
regarding a significant rate of recidivism among domestic vio-
lence misdemeanants establishes a substantial relationship
between keeping guns out of the hands of domestic violence
misdemeanants and reducing domestic gun violence. Again,
the government relies upon the findings and conclusions of
scholarly social science reports. For example, the government
cites a federally funded grant report finding that out of a sam-
ple of 3,662 suspects arrested for misdemeanor domestic vio-
lence in Cincinnati, Ohio between August 1993 and May
1996, 17% were re-arrested for domestic violence during the
three-year study period. *See* U.S. Dept. of Justice, National
Institute of Justice, John Wooldredge and Amy Thistlethw-

aite, *Reconsidering Domestic Violence Recidivism: Individual and Contextual Effects of Court Dispositions and Stake in Conformity* 6, NCJ 188509 (October 1999), available at http://www.ncjrs.gov/pdffiles1/nij/grants/188509.pdf. The government further points out that although this data accounts for repeat incidents resulting in re-arrest, it does not account for the many repeat domestic violence acts that are never reported to the police. In support, the government cites a social science report estimating that, based upon survey results, the recidivism rate ranges between 40% and 80% "when victims are followed longitudinally and interviewed directly." Carla Smith Stover, *Domestic Violence Research*, 20 J. Interpersonal Violence 448, 450 (2005), available at http://www.pineforge.com/isw6/articles/ch2stover.pdf. *See also* Julia C. Babcock, Charles Green, and Chet Robie, *Does batterers' treatment work? A meta-analytic review of domestic violence treatment*, 23 Clinical Psychology Review 1023, 1039 (2004), available at http://www.vrfca.org/dvrp/docs/Babcock_2004.pdf (estimating 35% recidivism rate based upon partner reports). Finally, the government relies upon a social science report appearing in the New England Journal of Medicine finding that "[o]ur data strongly suggest that the risk of homicide is markedly increased in homes where a person has previously been hit or hurt in a family fight." Arthur L. Kellermann, M.D., *Gun Ownership as a Risk Factor for Homicide in the Home*, 329 New England Journal of Medicine 1084, 1090 (1993), available at http://www.nejm.org/doi/pdf/10.1056/NEJM199310073291506.

In response to this social science evidence regarding the recidivism rate among domestic violence misdemeanants, Staten primarily argues on appeal that although the government offered quotations from and specific citations to the social science reports upon which it relies, the government should be considered to have proffered no evidence because the government did not offer paper copies of such reports as part of the record. The crux of the government's response is that the social science reports upon which it relies with

respect to all issues under intermediate scrutiny were and continue to be readily available for examination on the Internet and at no time below did Staten or the district court inform the government of any difficulty in accessing the reports.

We believe the far better practice is for the government to offer copies of whatever reports/articles upon which it seeks to rely in attempting to carry its burden under intermediate scrutiny for inclusion in the record at the district court level. However, with respect to the reports upon which the government relies in the present case, because Staten has never disputed the accuracy of either the government's representations as to their ready availability via the Internet or the accuracy of the government's representations as to their content, we reject Staten's argument that the government cannot rely upon the reports to meet its burden under intermediate scrutiny in this case. We also note that, with one exception which we will address later in this opinion, we had no trouble viewing such reports via the Internet using the websites included in the addendum to the government's appellate brief.

Staten also attacks the government's social science evidence regarding recidivism on the basis that the district court did not comment on the fact that, from report to report, recidivism rates vary from one in five to four in five. According to Staten, such variations suggest that none of the reports are particularly reliable. Finally, he criticizes the government's evidence on the ground that it does not compare the recidivism rates of domestic violence misdemeanants to other offenders such as violent felons. Notably, Staten has offered no evidence in the form of social science reports or otherwise to undermine the validity of the conclusions drawn in the social science reports relied upon by the government.

We reject Staten's arguments as just set forth. While Staten is correct that the recidivism rates provided in the social science reports relied upon by the government vary more than a trivial amount, a conservative conclusion to be drawn from

such reports is that the actual recidivism rate among domestic violence misdemeanants (including re-arrests and unreported incidents) is at least 33.3%. This is a substantial rate of recidivism. Moreover, having reviewed the scholarly social science evidence relied upon by the government ourselves, we find no reason to discount the validity of such evidence, and Staten has offered us none. The fact that both the Seventh Circuit sitting *en banc* and the First Circuit have relied upon this same social science evidence to conclude that the recidivism rate among domestic violence misdemeanants is high, *Booker*, 644 F.3d at 26; *Skoien II*, 614 F.3d at 644, is added reassurance that our reliance is justified. As the Seventh Circuit put it: "No matter how you slice these numbers, people convicted of domestic violence remain dangerous to their spouses and partners." *Skoien II*, 614 F.3d. at 644.

Moreover, the fact that the government does not offer evidence comparing the recidivist rates of domestic violence misdemeanants to other offenders such as violent felons is of no moment. Felons are already prohibited from possessing firearms, *see* 18 U.S.C. § 922(g)(1), and Congress is obviously entitled to address one societal problem at a time.

Having established that domestic violence is a serious problem in the United States and that the rate of recidivism among domestic violence misdemeanants is substantial, the government next seeks to establish that the use of firearms in connection with domestic violence is all too common, increases the risk of injury or homicide during domestic violence, and often leads to injury or homicide. In support of this proposition, the government first relies upon a report published by the Bureau of Justice Statistics, an arm of the United States Department of Justice, which reports that, for example, in 2005, 678 women and 147 men were fatally shot by their respective intimate partners in the United States. *See* U. S. Dept. of Justice, National Institute of Justice, Bureau of Justice Statistics, James Alan Fox and Marianne Zawitz, *Homicide Trends in the United States* at 101 (2007), available at

http://bjs.ojp.usdoj.gov/content/pub/pdf/htius.pdf.   For   the same year, 504 women and 182 men were killed by their respective intimate partners by a method other than being shot with a gun. *Id.* Thus, in 2005, 57% of women and 43% of men killed by an intimate partner in the United States were killed by a gun.[6] *Id.* Second, the government relies upon a social science report stating that among all female homicides nationwide approximately 40% to 50% were committed by intimate partners. Jacquelyn C. Campbell, *et al.*, *Risk Factors for Femicide in Abusive Relationships: Results From a Multistate Case Control Study*, 93 Amer. J. of Public Health 1089 (2003),   available   at   http://ajph.aphapublications.org/cgi/reprint/93/7/1089. Third, the government relies upon a social science report following a study of family and intimate assaults in Atlanta, Georgia, which report concludes that domestic violence incidents involving firearms are twelve times more likely to result in the death of the victim than assaults by knives or fists. *See* Linda E. Saltzman, *et al.*, *Weapon Involvement and Injury Outcomes in Family and Intimate Assaults*, 267 J. Am. Medical Ass'n No. 22, pp. 3043-47 (1992), abstract available at http://jama.ama-assn.org/content/267/22/3043.abstract.[7] Fourth and finally, the government relies upon Dr. Kellermann's social science report finding

---

[6]These percentages were 53% and 45% respectively for 2004 and 57% and 47% respectively for 2003. *Homicide Trends in the United States*, *supra*, at 101.

[7]The online citation provided by the government for the full-text version of this report requires a paid subscription to the Journal of the American Medical Association. Fortunately for the government, we were able to confirm the accuracy of the government's citation to our full satisfaction by viewing an abstract of the report on the Internet website for the Journal of the American Medical Association and by observing that the Seventh Circuit, sitting *en banc*, cited the same report for the same statistic in *Skoien II*, 614 F.3d at 643. Nonetheless, we are hereby putting the government on notice that, while it caught a break under the circumstances this time, if a social science report, article, or raw data upon which it relies is not readily available free of charge on the Internet, the government must offer a paper copy in the district court for the record in order for it to be considered.

that, after controlling for numerous other factors, keeping a
gun in the home is "strongly and independently associated
with an increased risk of homicide." Kellermann, *supra*, at
1084. Having reviewed these scholarly reports ourselves, we
have no trouble concluding that the government has indeed
established that the use of firearms in connection with domes-
tic violence is all too common, increases the risk of injury or
homicide during domestic violence, and often leads to injury
or homicide.

To summarize, the government has established that: (1)
domestic violence is a serious problem in the United States;
(2) the rate of recidivism among domestic violence misde-
meanants is substantial; (3) the use of firearms in connection
with domestic violence is all too common; (4) the use of fire-
arms in connection with domestic violence increases the risk
of injury or homicide during a domestic violence incident;
and (5) the use of firearms in connection with domestic vio-
lence often leads to injury or homicide. These established
facts along with logic and common sense compel us to hold
that the government has carried its burden of establishing a
reasonable fit between the substantial government objective
of reducing domestic gun violence and keeping firearms out
of the hands of: (1) persons who have been convicted of a
crime in which the person used or attempted to use force
capable of causing physical pain or injury to another against
a spouse, former spouse, or other person with whom such per-
son had a domestic relationship specified in § 921(a)(33)(A);
and (2) persons who have threatened the use of a deadly
weapon against such a person. In so holding, we consider
important the fact that Congress substantially tailored the
reach of § 922(g)(9) by limiting its application to those per-
sons who have used or attempted to use force capable of caus-
ing physical pain or injury in a domestic disturbance or those
persons who have threatened the use of a deadly weapon in
a domestic disturbance. We recognize that the net cast by
§ 922(g)(9) may be somewhat over-inclusive given that every
domestic violence misdemeanant would not necessarily mis-

use a firearm against a spouse, former spouse, or other person with whom such person had a domestic relationship specified in § 921(a)(33)(A), if permitted to possess one. However, this observation merely suggests that the fit is not perfect. Intermediate scrutiny does not require a perfect fit; rather only a reasonable one. *Masciandaro*, 638 F.3d at 474; *Chester II*, 628 F.3d at 683. In accord with the unanimous view of our sister circuits who have addressed the issue, we have no trouble concluding the fit here is, at least, reasonable. *See Booker*, 644 F.3d at 26 (upholding § 922(g)(9) against an as-applied Second Amendment challenge based upon conclusion that § 922(g)(9) substantially promotes important government objective of preventing domestic gun violence); *Skoien II*, 614 F.3d at 642 ("logic and data" establish a "substantial relation" between dispossessing domestic violence misdemeanants and important governmental goal of "preventing armed mayhem").

Accordingly, we hold that, on Staten's as-applied challenge under the Second Amendment, § 922(g)(9) satisfies the intermediate scrutiny standard. We, therefore, affirm the judgment of the district court.

*AFFIRMED*

# EXHIBIT B

Westlaw.

--- F.3d ----, 2011 WL 5928130 (C.A.9)
**(Cite as: 2011 WL 5928130 (C.A.9))**

**H**
Only the Westlaw citation is currently available.

United States Court of Appeals,
Ninth Circuit.
Russell Allen NORDYKE; Ann Sallie Nordyke,
dba TS Trade Shows; Jess B. Guy; Duane Darr;
William J. Jones; Daryl N. David; Tasiana Westy-
schyn; Jean Lee; Todd Baltes; Dennis Blair, R.L.
Adams; Roger Baker; Mike Fournier; Virgil
McVicker, Plaintiffs–Appellants,
v.
Mary V. KING; Gail Steele; Wilma Chan; Keith
Carson; Scott Haggerty; County of Alameda;
County of Alameda Board of Supervisors, Defend-
ants–Appellees.

No. 07–15763.
Nov. 28, 2011.

Donald Kilmer, Jr., The Law Offices of Donald
Kilmer, San Jose, CA, Don Kates, Michel & Asso-
ciates, P.C., Long Beach, CA, for
Plaintiffs–Appellants.

Thomas Peter Pierce, Richards, Watson & Gershon,
Los Angeles, CA, Sayre Weaver, Esquire,
Richards, Watson & Gershon, Brea, CA, Richard E.
Winnie, Esquire, Office of County Counsel, Oak-
land, CA, for Defendants–Appellees.

**ORDER**
KOZINSKI, Chief Judge:
   **\*1** Upon the vote of a majority of nonrecused
active judges, it is ordered that this case be reheard
en banc pursuant to Circuit Rule 35–3. The three-
judge panel opinion shall not be cited as precedent
by or to any court of the Ninth Circuit.

Judge RAWLINSON did not participate in the de-
liberations or vote in this case.

C.A.9,2011.
Nordyke v. King

--- F.3d ----, 2011 WL 5928130 (C.A.9)

END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.